**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Johnathan Adam Rogers, | No. CV-18-0260-TUC-BGM |
| Plaintiff, | |
| v. | **ORDER** |
| Andrew M. Saul,[1] Acting Commissioner of Social Security, | |
| Defendant. | |

Currently pending before the Court is Plaintiff's Opening Brief in Support of Vacature of the Decision of the Commissioner of Social Security on a Claim for a Period of Disability and Disability Insurance Benefits (Doc. 17). Defendant filed his Response Brief Requesting a Remand for Further Proceedings ("Response") (Doc. 21), and Plaintiff filed his Reply (Doc. 22). Plaintiff brings this cause of action for review of the final decision of the Commissioner for Social Security pursuant to 42 U.S.C. § 405(g). The United States Magistrate Judge has received the written consent of both parties, and presides over this case pursuant to 28 U.S.C. § 636(c) and Rule 73, Federal Rules of Civil Procedure.

. . .

. . .

---

[1] The Court takes judicial notice that Nancy A. Berryhill is no longer Acting Commissioner of the Social Security Administration ("SSA"). The Court will substitute the new Commissioner of the SSA, Thomas M. Saul, as Respondent pursuant to Rule 25(d) of the Federal Rules of Civil Procedure. *See also* Fed. R. App. P. 43(c)(2).

## I.  BACKGROUND

### A.  Procedural History

On January 21, 2015, Plaintiff filed a Title II application for Social Security Disability Insurance Benefits ("DIB") alleging disability as of June 11, 2014 due to neuroma, post-traumatic stress disorder ("PTSD"), degenerative disc disease, hypertension, sleep apnea, and migraines.  *See* Administrative Record ("AR") at 14, 31, 64–65, 71, 78–79, 82, 85–86, 90, 96, 181, 184, 242, 260.  The Social Security Administration ("SSA") denied this application on June 8, 2015.  *Id.* at 14, 64–77, 101–05. On July 7, 2015, Plaintiff filed a request for reconsideration, and on September 15, 2015, SSA denied Plaintiff's application upon reconsideration.  *Id.* at 14, 78–96, 106–09.  On October 8, 2015, Plaintiff filed his request for hearing.  *Id.* at 14, 110–11.  On February 13, 2017, a hearing was held before Administrative Law Judge ("ALJ") MaryAnn Lunderman.[2]  *Id.* at 14, 29–63.  On April 26, 2017, the ALJ issued an unfavorable decision. AR at 14–24.  On April 27, 2017, Plaintiff requested review of the ALJ's decision by the Appeals Council, and on October 25, 2017, review was denied.  *Id.* at 1–3, 165–66.  On May 22, 2018, Plaintiff filed this cause of action.  Compl. (Doc. 1).

### B.  Factual History

Plaintiff was thirty-seven (37) years old at the time of the administrative hearing and thirty-five (35) at the time of the alleged onset of his disability.  AR at 14, 23, 31–32, 64, 65, 71, 78–79, 86, 90, 94, 96, 167, 181, 184, 242, 260.  Plaintiff obtained a high school diploma.  *Id.* at 23, 35–36, 37–38, 71, 75, 77, 94, 96, 185.  Prior to his alleged disability, Plaintiff worked in the Army as infantry, a welder, and as an allied trades specialist.  *Id.* at 185, 191, 224–31.  Prior to the Army, Plaintiff worked in catering, as an automotive service technician, and construction foreperson.  *Id.* at 38–39, 224–31.

---

[2] The ALJ states that the hearing occurred on February 13, 2017, which is the date reflected in the notices of hearing sent to Plaintiff; however, the hearing transcript is dated March 13, 2017. AR at 14, 29–63, 132, 139, 159, 161.  The Court believes that the hearing occurred on February 13, 2017, because the Plaintiff indicated that he was thirty-seven (37) years old during the hearing. *Id.* at 32.

1    **1. Plaintiff's Testimony**

2    **a. Administrative Hearing**

3    At the administrative hearing, Plaintiff testified that he graduated from high school.

4    AR at 35–36. Plaintiff further testified that after high school, he joined the military and

5    was infantry, then a welder and machinist. *Id.* at 36. Plaintiff testified that prior to joining

6    the Army, he worked in construction and as an automotive mechanic. *Id.* at 38–39.

7    Plaintiff further testified that he is currently going to school on the GI bill for a welding

8    degree. *Id.* at 36–38. Plaintiff also testified that he receives income from Veterans Affairs

9    ("VA") for a ninety (90) percent disability rating. *Id.* Plaintiff testified that the VA

10   disability rating was for his PTSD, right shoulder, right foot, and implanted neuro

11   stimulator. AR at 34.

12   Plaintiff further testified that he is married with two children. *Id.* at 33. Plaintiff

13   also testified that he was in the Army for eight (8) years and two days. *Id.* at 36. Plaintiff

14   testified that he cannot handle large groups of people and generally has difficulty

15   interacting with people. *Id.* at 39–40. Plaintiff further testified that loud noises trigger his

16   PTSD and people make him very anxious. *Id.* at 40. Plaintiff also testified that he smokes

17   approximately a half of a pack of cigarettes per day and does not drink alcohol or take

18   illegal drugs or marijuana. AR at 40–41. Plaintiff noted that the only side effect of his

19   medications is some erectile dysfunction. *Id.* at 40.

20   Plaintiff testified that he can lift approximately twenty-five (25) to fifty (50) pounds.

21   *Id.* at 41, 46. Plaintiff further testified that he needs to get up after approximately fifteen

22   (15) to twenty (20) minutes of sitting, can walk about a block or block and a half, and can

23   stand for approximately ten (10) minutes at a time. *Id.* at 41, 47, 52. Plaintiff also testified

24   that when he is not at school he tries to help by taking the trash out daily, attempting to

25   cook instant meals once or twice per week, occasionally doing dishes, and sweeping or

26   mopping the floor. *Id.* at 41–42, 46–49. Plaintiff testified that he has a little hobby welder

27   at the house but does not have other hobbies. AR at 41.

28   Plaintiff testified that he requires accommodations at school due to his mental health

issues.  *Id.* at 42–44.  Plaintiff explained that he sometimes need to leave the booth when welding due to frustration and needs to leave the classroom because of the number of people.  *Id.* at 43–44.  Plaintiff estimated that when he leaves to collect himself, he requires approximately five (5) to ten (10) minutes before being able to continue.  *Id.*  Plaintiff testified that this occurs approximately four (4) times per class.  *Id.*  Plaintiff further testified that his teachers give him additional time to take tests and weld, as well as seating him in an area that is more secluded.  AR at 43–44.  Plaintiff also testified that he does not talk to his class mates.  *Id.* at 44.

Plaintiff testified that his wife had been paid by the VA to be his family care giver, but he was not sure if she was still being paid or if the payments had stopped and might be restarted.  *Id.*  Plaintiff further testified that he does not have a driver's license, because his wife and the VA social workers agreed that he should not drive.  *Id.* at 45.  Plaintiff further testified that he suffers from migraines and estimated that they occur once or twice per month.  *Id.*  Plaintiff explained that they last for a day and he has light and noise sensitivity.  AR at 45.  Plaintiff also testified that he has sleep difficulties including trouble falling and staying asleep, as well as nightmares.  *Id.* at 45–46.  Petitioner testified that he began sleeping in the recliner several months prior to the hearing.  *Id.* at 46.  Plaintiff further testified that he uses his cane  all the time, which was recommended by his doctors.  *Id.* at 47.  Plaintiff testified that he pets his animals, but his children feed and brush them.  *Id.* at 48.  Plaintiff also testified that he is easily distracted by noises or side conversation when trying to interact with people.  AR at 49.  Plaintiff further described anxiety attacks when he has his back to a door.  *Id.*  Plaintiff testified that his wife manages his medications for him by setting them out each day, although his pain medication does not always last for the entire dosing schedule.  *Id.* at 50–52.

### b. Administrative Forms

#### i. *Function Report—Adult*

On May 6, 2015, Plaintiff completed a Function Report—Adult in this matter.  AR 183–90, 213–20.  Plaintiff reported that he lived in a house with family.  *Id.* at 213.  Plaintiff

described his medical conditions as follows:

> PTSD limits ability to tolerate people and loud noises. SJS [(Stevens-Johnson Syndrome)] limits time in sun and heat. Pain in back, right shoulder, knees and right foot limits ability to walk and/or stand for long periods of time.

*Id.* Plaintiff also noted neuroma, degenerative disc disease, hypertension, sleep apnea, and migraines as medical conditions limiting his ability to work. *Id.* at 184. Plaintiff reported that he does "very little" during the day, noting that his "wife does everything," including caring for their children and pets. *Id.* at 214. Plaintiff further reported that he cannot be around people, be in the sun and heat, or walk or run, and that his PTSD causes nightmares. AR at 214.

Plaintiff indicated that he does not have problems with personal care, except he needs to be reminded to eat. *Id.* Plaintiff reported he prepares ramen on his own and does dishes and takes out the garbage. *Id.* at 215. Plaintiff noted that his ability to house and yard work is limited by pain, as well as his need to avoid heat and sun. *Id.* at 216. Plaintiff reported that when he goes out he either walks or rides in a car, but due to his PTSD he cannot go out alone and does not drive. *Id.* at 216. Plaintiff further reported that he can shop by computer for tools and car parts, which takes him approximately fifteen (15) minutes, but does not do it often. AR at 216. Plaintiff also reported that although he can count change, he cannot pay bills, handle a savings account, or use a checkbook or money orders, and as a result his wife takes care of all of their financials. *Id.* Plaintiff explained that a traumatic brain injury has affected his memory and impaired his money management capabilities. *Id.* at 217.

Plaintiff reported that he watches television daily, and does not spend time with other people. *Id.* Plaintiff indicated that he goes to a friend's house once or twice per week, but does not take part in many activities. *Id.* Plaintiff further reported difficulty in getting along with others due to violent outbursts, noting that he has become a recluse. AR at 218. Plaintiff reported that his conditions have affected his ability to lift, squat, bend, stand, reach, walk, kneel, talk, hear, climb stairs, remember, complete tasks, concentrate,

use his hands, and get along with others. *Id.* Plaintiff indicated that he cannot lift more than twenty (20) pounds, cannot squat, can stand for approximately ten (10) minutes, cannot reach above shoulder height, can walk for approximately five (5) minutes, cannot kneel, gets confused, has a hearing aid in his left ear, forgets easily, and is having rails installed. *Id.* Plaintiff further reported that he can walk for approximately five (5) minutes and then requires approximately five (5) minutes of rest. *Id.* Plaintiff also reported that he can pay attention for approximately two (2) to five (5) minutes, and cannot finish what he starts. *Id.*

Plaintiff noted that he can follow written and spoken instructions. AR at 218. Plaintiff reported that he does not get along well with authority figures and does not handle stress or changes in routine well. *Id.* at 219. Plaintiff further reported difficulty falling asleep and his PTSD causes recurring nightmares. *Id.* Plaintiff indicated that he requires a cane and hearing aid. *Id.*

On August 4, 2015, Plaintiff completed a second Function Report—Adult. *Id.* at 244–52. Plaintiff again noted that he lived in a house with family. AR at 244. Plaintiff described how his conditions limited his ability to work as follows:

> PTSD limits ability to be around crowds and small groups of people. Right shoulder and lower back hinders bending, reaching, and lifting. Right foot limits standing, walking, and standard mobility.

*Id.* Plaintiff stated that he attempts to help with chores around the house, but his wife cares for their children and animals, as well as being his VA appointed family care giver. *Id.* at 245. Plaintiff indicated that prior to his conditions, he could run, lift, reach, and be in crowds. *Id.* Plaintiff also reported that he cannot lay on his right side because of shoulder pain, and that sleep apnea and medications for PTSD and sleep limit his ability to sleep. *Id.*

Plaintiff reported difficulty with personal care, including pain affecting his ability to dress, having to sit while he bathes, using a cane to stand up, and needing his wife to help him shave his face and head, as well as to cook for him. AR at 246. Plaintiff further

reported that his wife reminds him to shower and take medication. *Id.* Plaintiff indicated that he does not cook because he cannot stand long enough to do so. *Id.* Plaintiff listed laundry as the only chore that he does and noted that he requires reminding to do so. *Id.* at 247. Plaintiff reported that he does not go out often because his Stephens-Johnson Syndrome diagnosis requires avoiding sun and heat. *Id.* Plaintiff noted that when he does go out, he rides in a car and cannot go out alone because of his PTSD. AR at 247–48. Plaintiff can count change, but does not shop and cannot pay bills, handle a savings account, or use a checkbook or money orders. *Id.* Plaintiff reported that his wife takes care of all of these tasks because he cannot concentrate on the tasks and is irresponsible with money. *Id.* at 248.

Plaintiff further reported watching television daily as his only hobby or interest. *Id.* Plaintiff also reported that he does not spend time with others and does not go anywhere on a regular basis. *Id.* Plaintiff described his anxiety as causing problems with people. AR at 249. Plaintiff reported that pain limits his physical abilities and PTSD limits his mental abilities. *Id.* Plaintiff noted that these issues affect his ability to lift, squat, bend, stand, reach, walk, kneel, talk, hear, climb stairs, see, remember, complete tasks, concentrate, understand, follow instructions, and get along with others. *Id.* Plaintiff estimated that he can walk fifty (50) feet before he needs to rest for ten (10) to fifteen (15) minutes. *Id.* Plaintiff also reported that he can only concentrate for two (2) to three (3) minutes. *Id.* Plaintiff indicated that he cannot finish what he started and cannot concentrate well enough to follow written instructions and also has difficulty with spoken instructions. AR at 249. Plaintiff reported difficulty in getting along with authority figures, handling stress, as well as changes in routine. *Id.* at 250. Plaintiff noted that he requires use of a cane, hearing aid, and glass or contacts. *Id.*

### ii. *Work History Report*

On May 6, 2015, Plaintiff also completed a Work History Report. *Id.* at 191–98, 222–31. Plaintiff listed his prior work in the military from 2006 through 2014, including infantry and allied trades specialist—welder. AR at 191–93, 224–26. Prior to his military

experience, Plaintiff worked in construction, as a mechanic, and in catering. *Id.* at 224, 227–29. Plaintiff described the position of allied trades specialist as welding, lifting metal, and fabricating parts. *Id.* at 225. Plaintiff reported that the job required the use of machines, tools, or equipment; technical knowledge or skills; and writing or completing reports or similar duties. *Id.* Plaintiff further reported that while working as an allied trades specialist he walked for between eight (8) and ten (10) hours per day; stood for between six (6) and seven (7) hours per day; sat for between two (2) and three (3) hours per day; climbed, stooped, and crawled, each for approximately one (1) hour per day; kneeled and crouched for approximately two (2) hours per day apiece; handled, grabbed, or grasped large objects, as well as reached, for between four (4) and five (5) hours per day; and wrote, typed, or handled small objects for between one (1) and two (2) hours per day. *Id.* Plaintiff noted that while performing the allied trades specialist job, he lifted large sheets of metal and carried them approximately 200 feet on a daily basis. AR at 225. Plaintiff described the position as requiring him to lift fifty (50) pounds frequently, and the heaviest weight he lifted was 300 pounds. *Id.* Plaintiff reported that he was a lead worker who supervised one (1) other person for between four (4) and five (5) hours per day. *Id.*

Plaintiff described his position in infantry as wearing body armor and training soldiers. *Id.* at 226. Plaintiff reported that he used machines, tools, or equipment for this position, as well as technical knowledge or skills, and wrote or completed reports, or performed other similar duties. AR at 226. Plaintiff further reported that the position required him to walk and stand for between eight (8) and ten (10) hours per day; climb, kneel, crouch, and crawl for approximately two (2) hours per day; sit for between two (2) and three (3) hours per day; handle, grab, or grasp big objects and reach for between four (4) and five (5) hours per day; write, type, or handle small objects for between one (1) and two (2) hours per day; and stoop for approximately one (1) hour per day. *Id.* Plaintiff also reported that he lifted and carried body armor, people, and weapons approximately 100 meters daily. *Id.* Plaintiff indicated that he would frequently lift between 100 and 200 pounds, and this was also the heaviest weight he lifted. *Id.* Plaintiff reported that he was

a lead worker and supervised three (3) people for the entirety of his workday. *Id*.

Plaintiff described his position in construction as framing, hanging, and finishing drywall. AR at 227. Plaintiff reported that he used machines, tools, or equipment for this position, as well as technical knowledge or skills, but did not write or complete reports, or perform other similar duties. *Id*. Plaintiff further reported that the position required him to walk; stand; handle, grab, or grasp big objects; reach; and write, type, or handle small objects for between eight (8) and twelve (12) hours per day; climb for between six (6) and eight (8) hours per day; stoop for between five (5) and eight (8) hours per day; and kneel and crouch for between four (4) and six (6) hours per day. *Id*. Plaintiff also reported that he lifted and carried wood and sheetrock between fifty (50) and 100 feet daily. *Id*. Plaintiff indicated that he would frequently lift fifty (50) pounds or more, and the heaviest weight he lifted was 100 pounds or more. *Id*. Plaintiff reported that he was a lead worker and supervised one (1) to two (2) people for between four (4) and eight (8) hours of the workday. AR at 227.

Plaintiff described his position as a service technician as performing oil changes. *Id*. at 228. Plaintiff reported that he used machines, tools, or equipment for this position, as well as technical knowledge or skills, but did not write or complete reports, or perform other similar duties. *Id*. Plaintiff further reported that the position required him to stand for between eight (8) and ten (10) hours per day; to stoop, kneel, crouch, or write, type, or handle small objects for between six (6) and eight (8) hours per day; reach for between four (4) and six (6) hours per day; walk for between one (1) and two (2) hours per day; and sit, climb, and handle, grab, or grasp big objects for approximately one (1) hour per day. *Id*. Plaintiff also reported that he lifted and carried tires for between ten (10) and twenty (20) feet, two to three times per week. *Id*. Plaintiff indicated that he would frequently lift ten (10) pounds, and the heaviest weight he lifted was 100 pounds or more. AR at 228. Plaintiff reported that he did not supervise others in this position. *Id*.

Plaintiff described his position in catering as cooking and cleaning. *Id*. at 229. Plaintiff reported that he used machines, tools, or equipment for this position, but did not

use technical knowledge or skills, or write or complete reports, or perform other similar duties. *Id*. Plaintiff further reported that the position required him to stand for approximately eight (8) hours per day; to stoop for approximately seven (7) hours per day; to walk, kneel, and crouch for approximately six (6) hours per day; to reach and write, type, or handle small objects for approximately four (4) hours per day; and sit for between three (3) and four (4) hours per day. *Id.* Plaintiff also reported that he lifted and carried pots, pans, and a mop and bucket for between ten (10) and fifty (50) feet daily. AR at 229. Plaintiff indicated that he would frequently lift less than ten (10) pounds, and the heaviest weight he lifted was 20 pounds. *Id*. Plaintiff reported that he did not supervise others in this position. *Id*.

### iii. Disability Report—Appeal

Plaintiff had a Disability Report—Appeal completed indicating that his pain had increased, particularly in his right shoulder, foot, and lower back. *Id.* at 233. Plaintiff described his pain as constant. *Id.* Plaintiff also noted that he experienced migraines once or twice every other week and was having nightmares every night. AR at 233. Plaintiff also reported that he had become less social due to his conditions and only left his home once per week. *Id.* Plaintiff reported that he could stand for ten (10) to twenty (20) minutes before needing to sit down and he could not kneel. *Id.* Plaintiff further reported that he cannot go to the grocery store because large groups of people give him anxiety. *Id.* Plaintiff also reported that he could not lift more than twenty (20) or thirty (30) pounds. *Id.* Plaintiff noted that he has to take breaks while doing chores and that his wife and children help him with chores and cooking. AR at 239. Plaintiff indicated that he could cook simple meals, but could no longer run and has difficulty dressing and showering whenever he has headaches. *Id.*

### 2. Plaintiff's Medical Records

#### a. Treatment records

On June 5, 2012, Plaintiff attended a group therapy session at the William Beaumont Army Medical Center ("AMC"), Biggs Behavioral Health Clinic. AR at 361–65.

Treatment notes written by Storey C. Smith, MA, MSW, indicated a moderate risk of violence and a significant history of PTSD secondary to combat trauma. *Id.* at 361, 363. Treatment notes further reflected discussion of a safety plan. *Id.* at 361. Plaintiff fully participated in group and exhibited a willingness to seek out and comply with treatment. *Id.* at 363–64. Plaintiff was also noted to have moderate symptoms of anxiety. *Id.* at 364. On June 18, 2012, Plaintiff was seen by Barry L. Seip, PA at William Beaumont AMC. AR at 358–60. Treatment records indicated that Plaintiff had a nerve stimulator implanted for foot pain after the excision of a Morton's neuroma. *Id.* at 358. Plaintiff also indicated that he was under evaluation by Orthopedics for right shoulder pain and that physical therapy did not help. *Id.* PA Seip assessed Plaintiff with joint pain localized in the right shoulder, with instability anteriorly and impingement findings. *Id.* at 359. PA Seip additionally noted acromioclavicular joint degeneration in Plaintiff's right shoulder. *Id.* PA Seip referred Plaintiff to further physical therapy pending evaluation by Orthopedics and noted he was non-deployable regarding this issue; however, the nerve stimulator was not deemed a barrier to deployment. AR at 359. On June 28, 2012, Plaintiff was seen by Alison Ryan Kinsler, M.D. in Orthopedics at William Beaumont AMC regarding subluxation in his right shoulder joint. *Id.* at 356–57. Plaintiff's active medications list included meloxicam, gabapentin, diclofenac sodium gel, trazodone HCL, sertraline HCL, lisinopril, meloxicam, oxycodone-acetaminophen, and diazepam. *Id.* at 356. Dr. Kinsler noted symptoms consistent with multidirectional instability; however, Plaintiff's CT arthrogram failed to demonstrate any labral or rotator cuff tears. *Id.* at 357. Dr. Kinsler opined that surgery would not be of benefit; however, recommended that his profile be altered for no pushups. *Id.* Dr. Kinsler further opined that Plaintiff has otherwise been able to perform his military duties and was deployable. AR at 357.

On July 5, 2012, Plaintiff was seen by April Alatorre, APN at William Beaumont AMC, Mendoza Behavioral Health, regarding his worsening temper and need for an adjustment of his medication. *Id.* at 351–55. Treatment records indicated that Plaintiff was becoming increasingly volatile and becomes angry with the slightest provocation. *Id.*

at 352–53.  APN Alatorre also noted that Plaintiff's use of a CPAP machine has improved his moods; however, he "still becomes enraged during driving and still has [a] megaphone attached to the roof [of] his car and will use it toward offending drivers."  *Id.* at 353.  APN Alatorre modified Plaintiff's medications to taper him off sertraline and switch to Paxil. *Id.* at 352.  On July 24, 2012, Plaintiff saw Melissa Michaels McElroy, FNP, at the William Beaumont AMC, Pulmonary Clinic for a follow-up regarding his obstructive sleep apnea. AR at 349–50.  Plaintiff was noted to be compliant with treatment and software was downloaded and a prescription for a battery pack given.  *Id.* at 349.  On July 25, 2012, Plaintiff saw Tara Williams, PA-C at the William Beaumont AMC, Mendonza Clinic for a finger injury.  *Id.* at 346–348.

On February 21, 2013, Plaintiff was seen by NP-C McElroy at the William Beaumont AMC, Pulmonary Clinic, for a routine follow-up regarding his sleep apnea.  *Id.* at 340–45.  NP-C McElroy recommended a slight adjustment to Plaintiff's CPAP settings. *Id.* at 342.  On March 11, 2013, Plaintiff was seen by Kenneth Nelson, M.D. at the William Beaumont AMC, Orthopedics Clinic regarding his right shoulder pain.  AR at 337–39.  Dr. Nelson reported that Plaintiff was seen at the request of his Colonel, because the Colonel believed an adjustment of Plaintiff's work profile was necessary.  *Id.* at 337.  Dr. Nelson noted that Plaintiff was on opioids and Ultram for pain control.  *Id.*  Plaintiff reported that he could voluntarily subluxate or even dislocate the right shoulder in an inferior direction, but his symptoms remained otherwise unchanged.  *Id.*  Dr. Nelson opined that Plaintiff was not a good candidate for surgery and did not adjust his status.  *Id.* at 339.  On April 23, 2013, Plaintiff was seen by Patricia Lopez-Po at the William Beaumont AMC, IPMC Pain Management Clinic regarding his right shoulder pain.  AR at 333–36.  Radiographs indicated a four (4) millimeter bone island near the greater tuberosity, but were otherwise unremarkable.  *Id.* at 336.

On May 3, 2013, Plaintiff was seen by APN Alatorre for a follow-up at Mendoza Behavioral Health.  *Id.* at 330–32.  Plaintiff reported that he was feeling irritable and hypersensitive, exhibiting destructive behavior such as throwing things, punching walls,

and destroying property but not people. *Id.* at 331. Plaintiff also reported middle of the night awakening and volatility, resulting in fatigue and withdrawal. *Id.* APN Alatorre adjusted Plaintiff's medications including starting Lamictal. AR at 332. On June 7, 2013, Plaintiff was seen by Samuel Almquist, M.D. at the William Beaumont AMC, Dermatology Clinic, for a follow-up regarding his Stevens-Johnson Syndrome. *Id.* at 328–29. Plaintiff suffered from a complete body rash and Lamictal was discontinued. *Id.*

On July 3, 2013, Plaintiff was seen by Laura Rubinate, D.O. at the William Beaumont AMC, Ophthalmology Clinic, for a consult regarding his photophobia and Stevens-Johnson Syndrome. *Id.* at 326–27. Dr. Rubinate reported no evidence of ophthalmic manifestations of Stevens-Johnson Syndrome. *Id.* at 326. On July 29, 2013, Plaintiff was seen by PA Seip at the William Beaumont AMC, Mendoza Clinic, for a follow up. AR at 319–25. PA Seip reviewed Plaintiff's medical history, including a "failed surgery to correct [a] [M]orton's neuroma in 2009 that eventually lead to SM having implanted neurostimulator in Nov[ember] of 2010[,] . . . worsening of r[ight] foot pain over [the] past 15 months[,] . . . chronic [right] shoulder pain stemming from combatives [sic] injury over one year ago . . . [with] non surgical [sic] arthritic changes, . . . [and] failed repeated attempts at conservative management with [physical therapy] and injected steroids[,] . . . anger issues[,] . . . and . . . [a] recent hospitalization for [Stevens-Johnson] syndrome triggered by mood stabilizer medication." *Id.* at 319. Upon physical examination, PA Seip reported a severely limited range-of-motion in Plaintiff's right shoulder resulting in moderate to severe pain when lifting the arm overhead and during a Hawkins-Kennedy impingement test. *Id.* at 319–20. PA Seip further reported deformity pain in Plaintiff's right foot over the site of the neuroma surgery, as well as pain between his fourth and fifth metatarsal radiating along the lateral foot and ankle. *Id.* at 320. On August 22, 2013, Plaintiff had a telephone consult with Dr. Lopez-Po to request a refill of his Percocet because he was taking four (4) per day and ninety (90) did not last the month. *Id.* at 317. Dr. Lopez-Po refilled Plaintiff's prescription, which directed Plaintiff to take

one (1) every six (6) hours.[3] AR at 318.

On October 3, 2013, Plaintiff was seen by Christopher Henthorne, DC at the William Beaumont AMC, Chiropractic Clinic. *Id.* at 313–16. Plaintiff complained of back pain from the bottom of his ribs to his tailbone and that had been present for approximately eight (8) months without a specific mechanism of injury. *Id.* at 314–16. Dr. Henthorne reported that Plaintiff's lumbar range of motion was limited in all directions and assessed lumbosacral intervertebral disc degeneration, as well as segmental dysfunction of thoracic region. *Id.* at 315. On October 4, 2013, Plaintiff was seen by Debra Draluck, M.D. at the William Beaumont AMC, Soldier Family Medical Clinic ("SFMC")-Traumatic Brain Injury ("TBI") Clinic regarding his headaches, memory and sleep issues, and tinnitus. *Id.* at 308–12. Dr. Draluck assessed that Plaintiff's headaches developed after his hospitalization for Stevens-Johnson syndrome, rather than due to his TBI, and that Plaintiff's memory issues were also more likely related to PTSD than his TBI. AR at 311–12. Dr. Draluck added Imitrex to Plaintiff's medications for headache pain. *Id.* On October 31, 2013, Plaintiff was seen by Glenda Wolfe, LTC, USANC, PMHNP-BC, MSN, RN at the William Beaumont AMC, Behavioral Health Clinic for a medication re-evaluation. *Id.* at 303–307. Plaintiff reported continued excessive irritability and difficulty sleeping. *Id.* at 304. NP Wolfe's assessment of Plaintiff included PTSD and persistent insomnia with a GAF of 60. *Id.* at 305. NP Wolfe increased Plaintiff's Paxil prescription and added mirtazapine for anxiety induced insomnia. AR at 305.

On November 12, 2013, Plaintiff followed up with Dr. Draluck regarding his memory and concentration issues. *Id.* at 300–302. Plaintiff reported that the Imitrex was helping with his headaches and his insomnia and nightmares were improved with medication. *Id.* at 300. Dr. Draluck's examination was unremarkable, and she assessed PTSD as the likely etiology of Plaintiff's symptoms and that his memory issues were likely multifactorial, but unrelated to his prior TBI. *Id.* at 300–301.

On December 9, 2013, Plaintiff was seen by Jenna Tolton, PA at the William

---

[3] The Court notes that this prescription equals the four (4) per day that Plaintiff was taking.

Beaumont AMC for a possible broken nose due to a fall. *Id.* at 297–99. PA Tolton's examination indicated an "abrasion with surrounding erythema and slight swelling immediately distal to bridge of nose with [thrombotic thrombocytopenic purpura ("TTP")] in the same area; no obvious misalignment; not [sic] TTP of eye orbits and [pupils equal, round, reactive to light, and accommodation] with full [extra-ocular muscles]." *Id.* at 298. Plaintiff opted not to have x-rays taken, but agreed to monitor symptoms and return if they worsened. AR at 297–99. On December 16, 2013, Plaintiff saw NP Wolfe regarding medication management. *Id.* at 292–96. Plaintiff reported a need to increase his gabapentin prescription to maintain decreased anxiety, that he was no longer irritable, and was sleeping well. *Id.* at 292. NP Wolfe's examination was unremarkable and she assessed a GAF of 70. *Id.* at 292–93. NP Wolfe continued Plaintiff's medications as prescribed. *Id.* at 294.

On January 3, 2014, Plaintiff was seen by Dr. Draluck for a follow-up TBI evaluation at the William Beaumont AMC, SFMC–TBI. AR at 290–91. Dr. Draluck noted that Plaintiff was receiving occupational therapy for his memory and concentration issues and Imitrex was helping with his headaches. *Id.* at 290. Dr. Draluck's examination of Plaintiff was unremarkable. *Id.* at 290–91. Dr. Draluck further noted that Plaintiff was anticipated to have two (2) more occupational therapy sessions before discharge, again indicating that these were more likely PTSD related rather than due to his TBI. *Id.* at 291. On February 21, 2014, Plaintiff was seen by Christy Newland, PA-C at the William Beaumont AMC regarding medication refills including gabapentin, mirtazapine, meloxicam, oxycodone [sic], prazosin, tramadol, Paxil, and clonidine. *Id.* at 288–89. PA Newland noted that Plaintiff was responding well to his current medications. AR at 289.

On March 18, 2014, Plaintiff was seen by Holger Brencher, O.D. for a visual acuity examination, which was unremarkable. *Id.* at 287. On March 20, 2014, Plaintiff was seen by Rene Pedroza, Au.D. at the William Beaumont AMC regarding a concerned moderately severe hearing loss in the right ear. *Id.* at 284–86. Plaintiff had been previously fitted for a hearing aid in the left ear due to a moderate high frequency Sensorineural Hearing Loss

("SNHL"). *Id.* at 284. Dr. Pedroza reported that right ear testing did not indicate any significant deficits. *Id.* at 284–85. On April 9, 2014, a care management note indicated that Plaintiff had been determined to be "physically unfit" due to several medical conditions including, but not limited to, PTSD, degenerative osteoarthritis in the right shoulder, and recurrent moderate pain over post-surgical neuroma site. AR at 840–42. On April 30, 2014, Plaintiff was seen by PA Newland at the William Beaumont AMC for a medication refill. *Id.* at 280–83. PA Newland noted that Plaintiff was in the process of being medically retired due to his severe, chronic PTSD. *Id.* at 283.

On June 17, 2014, Plaintiff was seen at Southern Arizona Veterans Affairs Health Care System ("SAVAHCS") in Tucson, Arizona to establish care. *Id.* at 819–41. Mark A. Hendrickson, M.D. examined Plaintiff and his treatment records noted Plaintiff's medications to include lisinopril, meloxicam, Percocet, tramadol, clonidine, prazosin, gabapentin, paroxetine, sildenafil, mirtazapine, and sumatriptan. *Id.* at 830. Dr. Hendrickson reviewed Plaintiff's ongoing physical issues including right shoulder pain, lower back pain, and right foot and ankle pain, as well as his PTSD history. AR at 829–41. Plaintiff reported stress due to moving to Sierra Vista and not having a local support system, but happy to live in a rural area allowing him to avoid people. *Id.* at 839. On the same date, Steve Randall, LCSW performed Plaintiff's behavioral health interview to establish care. *Id.* at 819–25. Plaintiff reiterated his concerns regarding financial stress. *Id.* at 823.

On August 6, 2014, Plaintiff was seen by Patricia L. Fields, M.D. at SAVAHCS for an outpatient psychiatric assessment. *Id.* at 800–807. Plaintiff reported being "sick of taking so many meds to control outbursts." AR at 800, 804. Treatment records reflect Plaintiff's PTSD and obstructive sleep apnea diagnoses, and his desire to decrease his depression, anger, and anxiety. *Id.* at 804. Plaintiff continued to suffer from nightmares without prazosin. *Id.* at 803–804. Plaintiff scored a sixty-one (61) on the PTSD Checklist. *Id.* at 805.

In early September 2014, Plaintiff was diagnosed with strep throat and prescribed

antibiotics. *Id.* at 788–92. On September 19, 2014, Plaintiff was seen by Leiann J. Hawley, LCSW for mental health treatment. AR at 781–86. Plaintiff denied interest in therapy; however, his wife reported anger issues and pleaded for assistance. *Id.* at 781–82. Treatment records indicated that Plaintiff "displayed an expansive demonstration of mood, with both histrionic and narcissistic qualities." *Id.* at 782. Ms. Hawley further noted that "[f]urther evaluation of personality may be beneficial for diagnostic and treatment." *Id.* On September 29, 2014, Plaintiff was seen at the SAVAHCS pain clinic. *Id.* at 775–80. Plaintiff reported pain interfering with varying life activities from moderately to severely. AR at 775. Treatment records indicated that Plaintiff has continued stabbing chronic right foot pain, in addition to low back and right shoulder pain. *Id.* at 779. Treatment records further indicated that Plaintiff might benefit from topical lidocaine ointment and custom orthotics. *Id.* at 779–80.

On October 1, 2014, Plaintiff was seen by Denise Hawks, M.D., Ph.D. at SAVAHCS for medication management and brief psychotherapy. *Id.* at 768–73. Dr. Hawks reported that Plaintiff had a good response to treatment and felt that medications were working well for him, though he was still having nightmares. *Id.* at 769, 772. Dr. Hawks increased Plaintiff's prazosin in an effort to further reduce his nightmares. AR at 772. Dr. Hawks's evaluation was otherwise unremarkable. *Id.* at 768–73. On October 21, 2014, Plaintiff was seen by Anita Pender, M.D. for an evaluation regarding joint pain. AR at 765–68. Plaintiff reported that he had participated in physical therapy with negative results and that cortisone shots in his shoulder did not help significantly. *Id.* at 765. Radiographs of Plaintiff's right shoulder showed hypertrophic osteoarthrosis of the acromioclavicular joint and impingement. *Id.* at 767. Dr. Pender recommended avoidance of movements that worsen his pain. AR at 767. On October 22, 2014, Plaintiff was seen by James A. Averett, D.P.M. and Billy R. Martin, D.P.M. at SAVAHCS for evaluation of his right foot pain. *Id.* at 761–65. Plaintiff reported that his spinal cord stimulator had been helpful previously, but was not working currently. *Id.* at 764. Radiographs indicated "[n]o acute osseous or soft tissue pathology . . [and] [a] [h]allux valgus deformity with

minimal [degenerative joint disease in the] first [metatarsophalangeal] joint." *Id.* at 765.

Plaintiff received an injection for pain and was casted for custom orthotics. *Id.* at 761–62,

765. In the late evening of October 25, 2014, Plaintiff was brought to the Sierra Vista

Regional Health Center ("SVRHC") Emergency Department. AR at 391–96, 404. On

October 26, 2014, Plaintiff was held in the Emergency Department for a behavioral health

placement. *Id.* at 397–403, 417–28, 458–64. Treatment records indicated that Plaintiff

had two (2) knives on his person prior to arrival, but had no memory of his PTSD episode.

*Id.* at 418–19, 423, 458–59, 491, 744. A Crisis Risk Assessment completed on the same

date indicated that "a very bloody movie set him off and police were called." *Id.* at 443,

451. At the time of the hold, however, Plaintiff was calm. *Id.* at 448–52. Plaintiff's hold

continued through October 27, 2014. AR at 397–403, 452–57. On October 27, 2014,

Plaintiff was admitted to SAVAHCS identified as having suicidal and homicidal ideation.

*Id.* at 743–61. Plaintiff reported that he had been having blackouts and got violent. *Id.* at

684, 747, 754. Treatment records from October 28, 2014 indicated that Plaintiff's wife

reported that Plaintiff had consumed excessive amounts of brandy prior to the episode that

resulted in hospitalization. *Id.* at 741. Plaintiff's wife further reported that Plaintiff was

compliant with his medication outside of the hospital; however, often expresses suicidal

thoughts when he is drunk. *Id.* Treatment records indicated that Plaintiff was started on

"lithium for augmentation and mood stabilization." AR at 739. Plaintiff's prazosin

prescription was also increased to aid with nightmares. *Id.* Plaintiff participated in group

therapy while hospitalized and consistently reported irritability. *Id.* at 716, 729, 732.

Treatment records from Plaintiff's October 29, 2014 evaluation for his chronic pain

indicated that Plaintiff's implantable pulse generator—spinal cord stimulator—was not

working and Plaintiff also reported that his pain was not well controlled with his current

medications. *Id.* at 712. While hospitalized, Plaintiff completed a Multidimensional Pain

Inventory which indicated pain in his right foot, right shoulder, and back; significant

impairment at home due to chronic pain; moderately severe insomnia, nightmares, and

acting combatively toward his wife while sleeping; difficulty with interpersonal distress in

his marriage; mildly agitated mood; difficulty with high affective distress; and the avoidance of many activities that involve pain. *Id.* at 724–25. Plaintiff expressed a lack of willingness to participate in group-based programs. AR at 726. Plaintiff also admitted hearing his name called and seeing shadows around corners, evidencing auditory and visual hallucinations. *Id.* Radiographs of Plaintiff's thoracic and lumbar spine were unremarkable. *Id.* at 988–89. On October 31, 2014, treatment records indicated that Plaintiff continued to suffer back and shoulder pain, as well as anxiety, anger, and auditory hallucinations. *Id.* at 690–91, 694, 698–99, 703, 705, 706, 711. Plaintiff also expressed concerned regarding the status of his marriage. *Id.* at 699, 703, 707. Dr. Koschorke adjusted Plaintiff's medications including discontinuing meloxicam and tramadol and starting topiramate. AR at 709–10. Additionally, Plaintiff participated in group therapy. *Id.* at 689. On November 1, 2014, Plaintiff continued to have anxiety, as well as auditory and visual hallucination. *Id.* at 681. On November 2, 2014, Plaintiff participated in group therapy and continued to suffer anxiety, and auditory and visual hallucinations. *Id.* at 678. Plaintiff was discharged on November 3, 2014. *Id.* at 491–92, 664–77, 870–80. Diagnoses at discharge included PTSD, unspecified personality disorder, mild alcohol use disorder, tobacco use disorder, and chronic pain. AR at 665. On November 5, 2014, Plaintiff was seen for a post-discharge follow-up and reported feeling better. *Id.* at 661.

On December 8, 2014, Plaintiff was seen at the SVRHC Emergency Department for shakes possibly due to a lithium overdose. *Id.* at 370–90, 647–48. Treatment records indicated that Plaintiff was started on lithium in October and the dosage increased in December. *Id.* at 373. Plaintiff was released with instructions to follow-up with the VA the following day. *Id.* at 374, 384. Records also indicated consideration of Plaintiff's need for a family caregiver, noting a low dependence score. AR at 649–55. On December 9, 2014, Plaintiff followed up with SAVAHCS mental health regarding his Emergency Department visit. *Id.* at 643–46. Plaintiff was advised to reduce his caffeine intake because it could be exacerbating his negative moods. *Id.* at 643. On December 22, 2014, Plaintiff left a message regarding the need for medication renewal. *Id.* at 640–42. Plaintiff's wife

also reported that she completed her caregiver training and that the family was under financial stress. *Id.* at 639.

January 5, 2015 treatment records indicated that Plaintiff's wife reported his mood swings as quicker, but occurring further apart. AR at 635, 637–39. Plaintiff's wife further reported that Plaintiff was not sleeping well, including waking at the slightest noise, cursing and yelling in his sleep, and snoring despite compliance with his CPAP machine. *Id.* Plaintiff expressed a desire to stop lithium due to negative side effects. *Id.* Plaintiff also indicated that the topical lidocaine did not improve his foot pain. *Id.* at 634. On January 6, 2015, Plaintiff's wife called regarding Plaintiff's diarrhea and continued nightmares despite taking prazosin. *Id.* at 629–33. Plaintiff was told to stop lithium completely to see if his gastrointestinal symptoms resolve. AR at 629. On January 7, 2015, Plaintiff had a teleconference regarding hemorrhoid pain after previous gastrointestinal issues. *Id.* at 625–28, 980–83. On January 8, 2015, Plaintiff's wife was given an initial assessment as Plaintiff's caregiver. *Id.* at 620–24, 975–80. On January 23, 2015, a caregiver in-home assessment took place. *Id.* at 609–19, 965–74. Assessment records indicated that Plaintiff had a positive screen for depression. *Id.* at 612, 968. On January 26, 2015, Plaintiff's wife was issued a caregiver certificate. AR at 597–608. On January 27, 2015, Plaintiff was seen by Dr. Hawks for supportive therapy and medication management. *Id.* at 590–597, 956–63. Treatment records indicated that Plaintiff's tremor was caused by excessive caffeine, and Plaintiff discontinued lithium due to diarrhea. *Id.* at 590, 956. Dr. Hawks discussed the use of carbamazepine for mood stability and anger reduction, as well as its possible use in aiding sleep. *Id.* at 590, 956–57. Dr. Hawks reported Plaintiff's mood as "angry" with an irritable, angry affect, but capable of full range. *Id.* at 592, 958. Dr. Hawks prescribed carbamazepine, increased prazosin, and continued paroxetine. AR at 593, 960. A PTSD Checklist (Civilian) was performed, was positive, and Plaintiff's score was 64. *Id.* at 595–97, 961–63. On the same date, an in-home assessment for the caregiver program occurred. *Id.* at 588–90, 954–56.

On February 13, 2015, Plaintiff had a teleconference with the pharmacy regarding

his right foot pain. *Id.* at 586–87, 952–53. Plaintiff's oxycodone/acetaminophen prescription was adjusted. *Id.* On March 11, 2015, Plaintiff's home was assessed for a Home Improvements and Structural Alterations ("HISA") grant to make the bathroom safer for Plaintiff. AR at 579–80, 947–48. On March 18, 2015, Dr. Hawks's office called and spoke with Plaintiff's wife. *Id.* at 577–79, 945–47. Plaintiff's wife reported that the carbamazepine was causing Plaintiff to sleep a lot and be very tired. *Id.* at 578, 945. Plaintiff was advised to cease the carbamazepine because he would not be able to tolerate a high enough dose to positively impact his mood. *Id.* at 578–79, 946.

On April 8, 2015, Plaintiff attended the mandatory Controlled Substance Education class. *Id.* at 574–75, 940–42, 1060–61. Caregiver assessment records from April 13, 2015 indicated that Plaintiff's mirtazapine prescription would not be refilled until his blood pressure was better controlled. AR at 556, 563, 565, 938, 1042, 1057. On April 24, 2015, Plaintiff saw Dr. Hawks for supportive therapy and medication management. *Id.* at 550–54, 926–31, 1036–41. Treatment records indicated that Plaintiff was unable to sleep without mirtazapine, and as such Dr. Hawks restarted the prescription. *Id.* at 550, 553, 927, 930, 1037, 1040. Dr. Hawks noted that Plaintiff was not as irritable as in past visits. *Id.* at 552, 928, 1038.

On May 11, 2015, Plaintiff was seen by primary care regarding a cyst behind his right ear. *Id.* at 921–26, 1033–36, 1462–65. On May 13, 2015, Plaintiff had a caregiver program in-home assessment. AR at 916–19, 1026–29, 1454–57. Plaintiff's wife reported that "the list of triggers 'got bigger.'" *Id.* at 917, 1027, 1456. Plaintiff's wife also indicated that her own attention deficit hyperactivity disorder causes difficulty with communication resulting in Plaintiff becoming frustrated. *Id.* at 917–18, 1027–28, 1455–57. Plaintiff became agitated when discussing difficulty in getting services due to limited cellular telephone minutes and non-functioning vehicle. *Id.* at 918, 1028, 1457. On May 28, 2015, Plaintiff underwent a surgery consult regarding the small cyst behind his right ear. *Id.* at 915–16, 1025, 1165, 1454.

On June 2, 2015, Plaintiff had a cyst removed from behind his right ear. AR at 908–

13, 988, 1018–23, 1447–52. On June 24, 2015, Plaintiff was seen for follow-up regarding his medication changes. *Id.* at 897–900, 1007–10, 1436–38. Plaintiff requested switching to trazodone from mirtazapine, as the latter caused him to sleep too deeply. *Id.* at 897–98, 1007, 1436–37. Treatment records indicated Plaintiff continued to suffer anger and anxiety regarding finances and work occurring on their home. *Id.* at 898, 1007–08, 1436. A June 31, 2015 Psych. Panel was negative for oxycodone. *Id.* at 1384. On July 16, 2015, Plaintiff was assessed in-home. AR at 889–95, 993–1005, 1420–34. Plaintiff reported continued anxiety, but both Plaintiff and his wife noted his improved mood due to the trazadone. *Id.* at 891, 893, 995, 1001, 1430, 1432.

On August 14, 2015, Plaintiff's wife "called to report that [Plaintiff] [was] having problems withi [sic] his sleep again as well as his temperament." *Id.* at 1418. Plaintiff's wife also reported that Plaintiff stated he is not getting as much sleep. *Id.* On August 27, 2015, Plaintiff was seen by Dr. Hawks for supportive therapy and medication management. *Id.* at 1356–61. On August 31, 2015, Plaintiff was seen in the SAVAHCS Emergency Department after suffering a PTSD flashback and subsequently admitted. AR at 1342–56. Plaintiff was hospitalized following a dissociative reaction during a nap. *Id.* at 1125–31, 1288–1356. Treatment records indicated that Plaintiff may have suffered syncope and reported waking violently from a nap requiring his wife to restrain him. *Id.* at 1327, 1350–51. Plaintiff also reported an elevated pain level. *Id.* at 1347. During his hospitalization, Plaintiff tapered off Paxil and began Cymbalta. *Id.* at 1126–27, 1318. Plaintiff also participated in group therapy. AR at 1306–07, 1321. Treatment records noted that Plaintiff may have had anger issues prior to PTSD and that he seemed "to be struggling with meaning and purpose in his life." *Id.* at 1317. Treatment records further noted that Plaintiff "has [a] currently unspecified personality disorder[,] [and that] [t]he maladaptive cognitions and traits from this disorder distort diagnosis and interfere with the patient's motivation for change." *Id.* at 1291. Plaintiff was discharged on September 4, 2015. *Id.* at 1125, 1292–94. On September 11, 2015, Plaintiff had a follow-up after his hospitalization. *Id.* at 1158–59, 1282–83. Plaintiff was "slightly angry" and was not taking

his duloxetine as prescribed. AR at 1159, 1289. The assessment included PTSD, partner relational problems, and an unspecified personality disorder. *Id.*

On October 28, 2015, a telephonic assessment of Plaintiff and his caregiver was performed by the Caregiver Program. *Id.* at 1272–78. On November 16, 2015, Plaintiff was seen by Dr. Hawks. *Id.* at 1414–16. Treatment records indicated that Plaintiff had a "partial response to paroxetine, but remains unmotivated, low energy – may be more personality-driven, but will transition from paroxetine to duloxetine in effort to better address depression and pain symptoms[.]" *Id.* at 1416. Dr. Hawks listed Plaintiff's current problems as PTSD, relationship problems, and a personality disorder. AR at 1416. Plaintiff also saw Dr. Hendrickson for management of his chronic issues. *Id.* at 1265–71. Plaintiff complained of increased pain and a reduced range of motion in his right shoulder, with it going out of joint more frequently. *Id.* at 1265. Radiology records from the same date indicated "mild degenerative findings of the acromioclavicular joint . . . [and] dextroconvex curvature to the midthoracic spine." *Id.* at 1108. On November 23, 2015, Plaintiff was seen by Dr. Hawks for supportive therapy and medication management. *Id.* at 1408–14. Dr. Hawks noted that Plaintiff reported not noticing a significant benefit from the change to duloxetine, but he presented as less irritable. AR at 1408. Plaintiff indicated his plans to start school to study welding, beginning in January. *Id.* at 1409. Dr. Hawks's summary impression indicated that Plaintiff was "feeling better with duloxetine" and that he was in "good spirits and more easily engaged." *Id.* at 1412. Plaintiff's depression screen was negative; however, his PTSD checklist remained positive with a score of 50. *Id.* at 1412–13.

On December 30, 2015, Plaintiff and his wife received a caregiver program annual in-home monitoring assessment. *Id.* at 1390–1405. Plaintiff's dependence on his wife as caregiver remained unchanged. AR at 1391–92, 1399–1400. On January 7, 2016, Plaintiff was seen by Felix F. Jabczenski, M.D. for an orthopedic surgery consult to evaluate and treat his right shoulder. *Id.* at 1389–90. Dr. Jabczenski diagnosed a "[m]ild acromioclavicular (AC) joint synovitis right shoulder[,]" and recommended injection of

the joint with Depo-Medrol and Marcaine. *Id.*

On February 19, 2016, Plaintiff saw Dr. Hawks for supportive therapy and medication management. *Id.* at 1378–83. Dr. Hawks noted that both Plaintiff and his wife reported that "the duloxetine has not been helpful, with veteran continuing to be moody and irritable." *Id.* at 1378. Plaintiff was reported to be "active in school with welding classes and English class, in both of which he is doing very well, but is apathetic when he comes home[.]" AR at 1378. Plaintiff also reported that he was not finding trazadone helpful for sleep, and acquiesced to trying mirtazapine again. *Id.* at 1379. Dr. Hawks discontinued duloxetine and prescribed bupropion, as well as recommending the CHOICE program to Plaintiff and his wife for couples therapy. *Id.* at 1382. On March 21, 2016, Plaintiff was seen by Marissa Jackson, RN for a follow-up after his medication change. *Id.* at 1373–75. Plaintiff reported that his sleep remained "horrible," but the he was doing well in school and getting his welding degree. *Id.* at 1374. Plaintiff also reported that he forgot his cane, and although there was pain, he was not returning home to get it. AR at 1374.

On April 18, 2016, Plaintiff and his wife underwent a Caregiver Program ninety (90) day monitoring assessment. *Id.* at 1258–65, 1362–66. Plaintiff's wife described him as "frustrated and cranky" and "only taking his blood pressure and sleep medications as he did not like how the other medications made him feel." *Id.* at 1261, 1363. On April 27, 2016, Plaintiff was seen by Dr. Hawks for supportive therapy and medication management. *Id.* at 1245–52. Treatment records indicated that Plaintiff was more irritable with bupropion and discontinued use. *Id.* at 1249. Records further indicated that interactions with his wife, as well as challenges in an academic setting, trigger Plaintiff's persistent irritability. AR at 1249. Dr. Hawks prescribed nortriptyline for Plaintiff's PTSD and personality disorder. *Id.* at 1246, 1249. Dr. Hawks performed the PTSD Checklist (Civilian), which was positive with a score of 70. *Id.* at 1251.

On June 8, 2016, Plaintiff was seen by Nurse Jackson and reported that he had not reached the target dose of nortriptyline and had ceased mirtazapine completely. *Id.* at 1238–40. Plaintiff further reported a lack of noticeable difference in his mood and

irritability. *Id.* at 1238. On June 23, 2016, Plaintiff was seen by Dr. Hendrickson for chronic issue management. AR at 1229–33. Plaintiff indicated desire for an increase in his opioid prescription for his chronic foot pain; however, Dr. Hendrickson discussed the need to find a non-opioid solution to his symptoms. *Id.* at 1230–31. Dr. Hendrickson also reduced his lisinopril prescription, which he thought might be contributing to Plaintiff's orthostatic symptoms. *Id.* at 1231. On July 19, 2016, Plaintiff and his wife had a telephonic consultation with the Caregiver Program, which was unremarkable. *Id.* at 1216–25. On July 28, 2016, Plaintiff informed Emily Huynh, O.D. that he continued to experience extreme photophobia. *Id.* at 1211–14.

On August 18, 2016, Plaintiff was seen by Karen Schloemer Atencio, M.D. at the pain clinic for evaluation regarding his bilateral shoulder, low back, and right foot pain. AR at 1205–09. Dr. Atencio noted that Plaintiff became upset regarding the repetitive nature of questioning regarding his medication and indicated that "he just wanted his SCS battery replaced." *Id.* at 1206, 1208. Plaintiff further reported that shoulder injections were not effective. *Id.* at 1206. On September 9, 2016, Plaintiff was seen for a check of his spinal cord stimulator with the Med-tronics representative. *Id.* at 1202–03. Testing demonstrated that the implantable pulse generator was inoperable. *Id.* at 1203. On September 19, 2016, Eve L. Broughton, Clinical Nurse Specialist made a note in the records regarding Plaintiff's pain management consult. AR at 1199–1202. CNS Broughton noted that Plaintiff had refused to discuss his pain medication during his visit to the pain clinic and three of his previous drug screens had been negative for opioids and oxycodone. *Id.* at 1199. CNS Broughton expressed her concern regarding "the possibility of diversion and need [for] advice from pain specialists as to the best way to proceed." *Id.*

On October 19, 2016, the Caregiver Program spoke with Plaintiff's wife for a 90 day monitoring assessment. *Id.* at 1188–95. Plaintiff's wife indicated that Plaintiff no longer needed therapy, but also stated that he was not ready for therapy at that time. *Id.* at 1189–91, 1193–95. On November 2, 2016, the Family Caregiver Program determined that Plaintiff was no longer eligible for the program. AR at 1179–86. On December 9, 2016,

Plaintiff was seen by Dr. Hawks for supportive therapy and medication management. *Id.* at 1172–77. Plaintiff reported continued irritability, but agreed to increase mirtazapine to a therapeutic dose. *Id.* at 1172–73, 1176. Dr. Hawks noted Plaintiff's mood as irritable, as well. *Id.* at 1174. On December 15, 2016, Plaintiff arrived at the incorrect time for a neurosurgery appointment regarding his spinal cord stimulator, became angry, and left. *Id.* at 1171–72. On December 22, 2016, a medication management note by Dr. Hendrickson indicated his concern regarding diversion of Plaintiff's opioids. AR at 1169. Dr. Hendrickson spoke with Plaintiff on the telephone, but did not confront him directly regarding this issue, rather stating the concern generally. *Id.* Plaintiff did not respond to Dr. Hendrickson's concern. *Id.* On January 6, 2017, Plaintiff's wife called regarding the appeal of her family caregiver status. *Id.* at 1166.

### b. Examining physician

On June 2, 2015, Gwendolyn W. Johnson, Ph.D. examined Plaintiff for a Compensation and Pension Examination. AR at 880–89, 900–08, 1010–18, 1438–47. Dr. Johnson noted that Plaintiff was driven to the appointment by a friend. *Id.* at 888, 908, 1017, 1446. Dr. Johnson noted symptoms of Plaintiff's PTSD diagnosis included anxiety and suspiciousness. *Id.* Dr. Johnson opined that Plaintiff's PTSD symptoms did not cause "clinically significant distress or impairment in social, occupational, or other important areas of functioning." *Id.*

### c. Reviewing physicians

#### i. *James Sturgis, Ph.D.*

On May 29, 2015, James Sturgis, Ph.D. reviewed Plaintiff's medical records for the initial determination and provided a mental residual functional capacity assessment. AR at 68–69, 72–74. Dr. Sturgis opined that Plaintiff had understanding and memory limitations, with marked limitation in the ability to understand and remember detailed instructions. *Id.* at 73. Dr. Sturgis further opined that Plaintiff was not significantly limited in his ability to remember locations and work-like procedures or to understand and remember very short and simple instructions. *Id.*

Dr. Sturgis also opined that Plaintiff had sustained concentration and persistence limitations. *Id.* Dr. Sturgis found Plaintiff not significantly limited in his ability to carry out very short and simple instructions; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; to sustain an ordinary routine without special supervision; and to make simple work-related decisions. *Id.* Dr. Sturgis further found Plaintiff moderately limited in his ability to maintain attention and concentration for extended periods and markedly limited in his ability to carry out detailed instructions and work in coordination with or in proximity to others without being distracted by them, as well as to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. AR at 73.

Regarding social interactions, Dr. Sturgis opined that Plaintiff was markedly limited in his ability to interact appropriately with the general public and moderately limited in his ability to accept instructions and respond appropriately to criticism from supervisors and to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. *Id.* at 73–74. Dr. Sturgis found no significant limitation in Plaintiff's ability to ask simple questions or request assistance or to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. *Id.* at 74.

Dr. Sturgis opined that Plaintiff had adaptation limitations including marked limitation in the ability to respond appropriately to changes in the work setting. *Id.* Dr. Sturgis found no significant limitation in Plaintiff's ability to be aware of normal hazards and take appropriate precautions; to travel in unfamiliar places or use public transportation; and to set realistic goals or make plans independently of others. *Id.* Dr. Sturgis concluded that because of PTSD and an affective disorder, Plaintiff could perform simple tasks, but could not sustain eight (8) hours per day, forty (40) hours per week or adapt to the normal stress and change in routine expected in a simple, repetitive, routine work environment without special supervision. AR at 74. Dr. Sturgis further noted "significant limitations in [Plaintiff's] ability to tolerate criticism from supervisors and will only be able to interact

with peers and supervisors on a very limited, superficial basis[,] . . . [and] cannot interact with the general public." *Id.*

### ii. David M. Bailey, M.D.

On June 8, 2015, David M. Bailey, M.D. reviewed Plaintiff's medical records and provided a Residual Functional Capacity assessment. AR at 69–72. As an initial matter, Dr. Bailey opined that "one or more of the [Plaintiff's] medically determinable impairment(s) (MDI(s)) [could] reasonably be expected to produce the [Plaintiff's] pain or other symptoms[,] [and] . . . the [Plaintiff's] statements about the intensity, persistence, and functionally limiting effects of the symptoms [were] substantiated by the objective medical evidence alone[.]" *Id.* at 69–70. Dr. Bailey further opined that Plaintiff had exertional limitations. *Id.* at 70. These limitations included frequently lifting up to ten (10) pounds, standing or walking for a total of two (2) hours, and sitting for approximately six (6) hours in an eight (8) hour workday. *Id.* Dr. Bailey also opined that Plaintiff could never climb ladders, ropes, or scaffolds, but was otherwise unlimited in his ability to climb ramps and stairs, balance, stoop, kneel, crouch, or crawl. *Id.* at 70–71. Dr. Bailey did not find Plaintiff to have any manipulative, visual, or communicative limitations. AR at 71. Regarding environmental limitations, Dr. Bailey opined that Plaintiff should avoid concentrated exposure to noise and hazards, but was unlimited with regard to extreme cold and heat, wetness, humidity, vibration, and fumes, odors, dusts, gasses, or poor ventilation. *Id.*

### 3. Vocational Expert John Komar's Testimony

Mr. John Komar testified as a vocational expert at the administrative hearing. AR at 14, 52–63. Mr. Komar described Plaintiff's past relevant work in the military as a welder, Dictionary of Occupational Titles ("DOT") number 819.684-010, with a Specific Vocational Preparation ("SVP") of 2, and an exertional level of medium, but performed at as very heavy. *Id.* at 53–54. Mr. Komar further described the job of combat rifle crew member as DOT number 378.684-014, with an SVP of 3, and an exertional level of very heavy. *Id.* at 54. The last job Mr. Komar described was dry wall applicator as DOT number 342.361-030, with an SVP of 7 and exertional level of very heavy, but performed at heavy.

*Id.*

The ALJ asked Mr. Komar to consider a hypothetical individual of the same age, vocational, and educational background of the Plaintiff and without any exertional limitations, but limited to performing only simple, repetitive tasks learned in thirty (30) days or less or after a brief demonstration on the job, and the tasks should have minimal change in the task as assigned. *Id.* at 54. The ALJ placed a further limitation on the hypothetical individual, limiting him to no more than occasional contact with coworkers, supervisors, and the public. AR at 54. Mr. Komar testified that such an individual would not be able to perform Plaintiff's past work. *Id.* Mr. Komar further testified that such an individual would be able to perform other work, such as an industrial cleaner, DOT number 381.687-018, with an SVP of 2, and medium exertional level, and 113,700 jobs in the national economy. *Id.* Mr. Komar also suggested the hypothetical individual could work as a window cleaner, DOT number 389.687-014, with an SVP of 2, and medium exertional level, and 16,200 jobs in the national economy. *Id.* at 55. Mr. Komar's third suggestion was automobile detailer, DOT number 915.687-034, with an SVP of 2, and medium exertional level. *Id.* Mr. Komar testified that there were 53,000 of these positions in the national economy. AR at 55. The ALJ added to his hypothetical individual that such individual was limited to a full range of medium work and enquired whether the previously listed jobs would still be available. *Id.* Mr. Komar confirmed that the same three (3) jobs would be available. *Id.*

The ALJ then further reduced the exertional level that his hypothetical individual would be capable of from a full range of medium work to a full range of light work and asked about the work available to that person. *Id.* Mr. Komar testified that such an individual would be unable to perform Plaintiff's past work. *Id.* Mr. Komar further testified that the individual would be able to work as a collator operator, DOT number 208.685-010, with an SVP of 2, and light exertional level, and with 14,700 jobs in the national economy. AR at 55. Mr. Komar testified that another possible job would be advertising material distributor, which he described as a person who puts leaflets

underneath the windshield wipers of cars parked at a shopping mall, DOT number 230.687-010, an SVP of 2, exertional level of light, and with approximately 41,200 jobs in the national economy. *Id.* at 55–56. Mr. Nielson also testified regarding the availability of silver wrapper, DOT number 318.687-018, with an SVP of 1, light exertional level, and with 214,100 jobs in the national economy. *Id.* at 56.

The ALJ again modified his hypothetical individual to have the same non-exertional limitations, but reduced the exertional level to sedentary. *Id.* at 56. The ALJ then enquired whether such a hypothetical individual could do the jobs Mr. Komar had suggested, and if not, was there other work available. *Id.* Mr. Komar testified that such an individual could not do the previously suggested work, but could work as a document preparer, DOT number 249.587-018, with an SVP of 2, sedentary exertional level, and approximately 147,100 jobs in the national economy. AR at 56. Next, Mr. Komar suggested work as a table worker, DOT number 739.687-182, with an SVP of 2, and sedentary exertional level, and 124,000 jobs in the national economy. *Id.* Mr. Komar further testified regarding the availability of addresser, DOT number 209.587-010, with an SVP of 2, and a sedentary exertional level, and approximately 13,300 jobs in the national economy. *Id.*

Mr. Komar confirmed that the duties of a document and addresser had changed with new technology, but that the exertional level and other characteristics were consistent with the DOT. *Id.* at 56–57. Mr. Komar also testified that the jobs he identified were consistent with the DOT and the Selected Characteristics of Occupations ("SCO") descriptions, other than the addresser and the document preparer. *Id.* at 57. Mr. Komar noted that the DOT does not refer to the extent to which an individual interacts with coworkers, supervisors, or the general public, and as such his testimony in that regard was based on his experience as a vocational rehabilitation counselor. AR at 57.

Upon questioning by Plaintiff's counsel, Mr. Komar testified that using a cane 100 percent of the time would reduce the available work to the sedentary positions. *Id.* at 60–61. Mr. Komar also testified that all competitive work requires the ability to maintain attention and concentration for at least a two hour period continuously and a need for two

or more unscheduled breaks per hour would also preclude all employment. *Id.* at 61. Mr. Komar further opined that limiting the hypothetical individual's exposure to noise and environmental hazards would leave available work as an industrial cleaner, collator operator, silver wrapper, document preparer, and addresser, as well as the possibility of table worker. *Id.* at 61–62. Finally, Mr. Komar testified that in general, an employee can be absent once per month. *Id.* at 62.

### 4. Lay Witness Testimony

On May 1, 2015, Michele Rogers, Plaintiff's wife, completed a Function Report— Adult—Third Party. AR at 200–09. Ms. Rogers reported that Plaintiff lives in a house with family, and she spends several days with Plaintiff at a time. *Id.* at 202. Ms. Rogers further reported that Plaintiff "spends a lot of time in a great deal of pain[] and [his] mood swings can be violent[,] [h]e gets depressed often and cannot be in a room w[ith] more than three people at a time." *Id.* Ms. Rogers described Plaintiff as unable to "spend too long in sunlight or heat since the SJS and his migraines prohibit him from daily activities." *Id.* Ms. Rogers reported Plaintiff's typical day to include eating, sitting down, and being unable to focus. *Id.* at 203. Ms. Rogers observed that Plaintiff would start a project, "then his pain, the heat, or both [would] prevent him from completing [it]." AR at 203. Ms. Rogers further reported that she cares for Plaintiff, their children, and their pets. *Id.*

Ms. Rogers described Plaintiff before his conditions as calmer, able to sleep, and able to function around large groups. *Id.* Ms. Rogers indicated that Plaintiff's sleep apnea and recurring nightmares are disruptive of his sleep. *Id.* Ms. Rogers reported that Plaintiff's personal hygiene was normally "fine," although he sometimes forgets to eat or is unable to stop eating, and his interaction with their children is strained. *Id.* at 203–04. Ms. Rogers further reported that Plaintiff is able to make "something easy (ramen)" for lunch, but does not otherwise cook regularly. AR at 204. Ms. Rogers noted that Plaintiff regularly takes out the trash and does dishes, if he remembers or is reminded. *Id.* Ms. Rogers further noted that Plaintiff is unable to do house or yard work because he has to avoid too much heat or sun. *Id.* at 205.

Ms. Rogers reported that Plaintiff goes out once every three (3) to four (4) days, if a friend needs help or Plaintiff needs space. *Id.* Ms. Rogers further reported that Plaintiff either walks or rides in a car when he goes out, that he is not gone longer than three (3) hours, and cannot have weapons. *Id.* Ms. Rogers also reported that Plaintiff does not drive because his road rage is more violent and his pain prevents driving. AR at 205. Ms. Rogers observed that Plaintiff can shop for car parts or tools online, and although Plaintiff can count change, his conditions require that she manage the money and bills for their household. *Id.* Ms. Rogers explained that Plaintiff's traumatic brain injury has caused his memory to be bad, and Plaintiff becomes violent with the bill people. *Id.* at 206.

Ms. Rogers described Plaintiff's hobbies and interests and watching television, welding, helping someone, stereos, and mechanics. *Id.* Ms. Rogers confirmed, however, that Plaintiff watches television and does little else. *Id.* Ms. Rogers also confirmed that Plaintiff does not spend time with others, but may go to a friend's house for a couple of hours, once in a while. AR at 206. Ms. Rogers described Plaintiff as having problems getting along with others, marked by violent outbursts due to a lack of patience or ignorant individuals. *Id.* at 207. Ms. Rogers further described Plaintiff as exhibiting "isolation, moodiness, laziness, over or undereating, sleep deprivation, and low interest" when it comes to social activities. *Id.*

Ms. Rogers reported that Plaintiff's conditions affect his ability to squat, bend, stand, reach, walk, kneel, talk, hear, climb stairs, see, remember, complete tasks, concentrate, and get along with others. *Id.* Ms. Rogers further reported that Plaintiff is able to walk for approximately twenty-five (25) to thirty (30) minutes before requiring ten (10) to fifteen (15) minutes of rest. *Id.* Ms. Rogers noted that Plaintiff can pay attention for approximately five (5) minutes, and cannot follow spoken instructions because he does not remember or hear all of them, but is better with written instructions. AR at 207. Ms. Rogers described Plaintiff as being able to get along with authority figures for short periods, but that he cannot handle stress or changes in routine. *Id.* at 208.

Ms. Rogers also reported that Plaintiff attempted suicide in October 2014, and

mentioned that he also tried to protect her from unknown attackers. *Id.* Ms. Rogers indicated that Plaintiff relies on a cane and hearing aid, but the neuro-stimulator that he has is no longer working. *Id.* Ms. Rogers noted that Plaintiff is on a great deal of medication, mostly to treat his night terrors and mood from PTSD. *Id.* at 209. Ms. Rogers further reported that Plaintiff is unaware of his mood, which is a problem at home with their children, and if he does not take his mirtazapine, he reenacts his horror on her in his sleep. AR at 209. Ms. Rogers described Plaintiff as very volatile and unstable without medication. *Id.* Ms. Rogers also described Plaintiff as having an inability to function in large groups, as well as a lack of filter when speaking. *Id.*

## II. STANDARD OF REVIEW

The factual findings of the Commissioner shall be conclusive so long as they are based upon substantial evidence and there is no legal error. 42 U.S.C. §§ 405(g), 1383(c)(3); *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008). This Court may "set aside the Commissioner's denial of disability insurance benefits when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999) (citations omitted); *see also Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1098 (9th Cir. 2014).

Substantial evidence is "'more than a mere scintilla[,] but not necessarily a preponderance.'" *Tommasetti*, 533 F.3d at 1038 (quoting *Connett v. Barnhart*, 340 F.3d 871, 873 (9th Cir. 2003)); *see also Garrison v. Colvin*, 759 F.3d 995, 1009 (9th Cir. 2014). Further, substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007). Where "the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ." *Tackett*, 180 F.3d at 1098 (citing *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992)); *see also Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007). Moreover, the court may not focus on an isolated piece of supporting evidence, rather it must consider the entirety of the record weighing both evidence that supports as well as

that which detracts from the Secretary's conclusion. *Tackett*, 180 F.3d at 1098 (citations omitted).

## III.  ANALYSIS

### A.  *The Five-Step Evaluation*

The Commissioner follows a five-step sequential evaluation process to assess whether a claimant is disabled.  20 C.F.R. § 404.1520(a)(4).  This process is defined as follows:  Step one asks is the claimant "doing substantial gainful activity[?]"  If yes, the claimant is not disabled; step two considers if the claimant has a "severe medically determinable physical or mental impairment[.]"  If not, the claimant is not disabled; step three determines whether the claimant's impairments or combination thereof meet or equal an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App.1.  If not, the claimant is not disabled; step four considers the claimant's residual functional capacity and past relevant work.  If claimant can still do past relevant work, then he or she is not disabled; step five assesses the claimant's residual functional capacity, age, education, and work experience. If it is determined that the claimant can make an adjust6ment to other work, then he or she is not disabled.  20 C.F.R. § 404.1520(a)(4)(i)-(v).

In the instant case, the ALJ found that Plaintiff had not engaged in substantial gainful activity since his alleged onset date of June 11, 2014.  AR at 16.  At step two of the sequential evaluation, the ALJ found that "the claimant has the following severe impairments: right foot impairment; lumbar degenerative disc disease, affective disorder; anxiety disorder, post-traumatic stress disorder (PTSD); and personality disorder (20 CFR 404.1520(c))."  *Id.*  The ALJ further found that "[t]he claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526)."  *Id.* at 17.  Prior to step four and "[a]fter careful consideration of the entire record," the ALJ determined that "the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) with certain additional

non-exertional limitations[][—][s]pecifically, assigned work must be limited to simple repetitive tasks learned in 30 days or less or through a brief on the job demonstration[,] . . . the assigned tasks must involve minimal changes as assigned[,] . . . [and] contact with coworkers, supervisors and the public must be limited to occasionally." *Id.* at 18. At step four, the ALJ found that "[t]he claimant is unable to perform past relevant work." *Id.* at 23. At step five, the ALJ found that after "[c]onsidering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a))." AR at 23. Accordingly, the ALJ determined that Plaintiff was not disabled. *Id.* at 24.

Plaintiff asserts that the ALJ erred in failing to discuss the opinion of reviewing physician James Sturgis, M.D. and in rejecting the opinion of reviewing physician David Bailey, Ph.D., as well as finding Plaintiff partially credible. *See* Opening Br. (Doc. 17).

## B. *Plaintiff's Symptoms*

### 1. Legal standard

An ALJ must engage in a two-step analysis to evaluate a claimant's subjective symptom testimony. *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035–36 (9th Cir. 2007). First, "a claimant who alleges disability based on subjective symptoms 'must produce objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged[.]'" *Smolen v. Chater*, 80 F.3d 1273, 1281–82 (9th Cir. 1996) (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991) (*en banc*) (internal quotations omitted)); *see also Ghanim v. Colvin*, 763 F.3d 1154, 1163 (9th Cir. 2014). Further, "the claimant need not show that her impairment could reasonably be expected to cause the severity of the symptom she has alleged; she need only show that it could reasonably have caused some degree of the symptom." *Smolen*, 80 F.3d at 1282 (citations omitted); *see also Trevizo v. Berryhill*, 871 F.3d 664, 678 (9th Cir. 2017). "Nor must a claimant produce 'objective medical evidence of the pain or fatigue itself, or the severity thereof.'" *Garrison v. Colvin*, 759 F.3d 995, 1014 (9th Cir. 2014) (quoting

*Smolen*, 80 F.3d at 1282). "[I]f the claimant meets this first test, and there is no evidence of malingering, 'the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so.'" *Lingenfelter*, 504 F.3d at 1036 (quoting *Smolen*, 80 F.3d at 1281); *see also Burrell v. Colvin*, 775 F.3d 1133, 1137 (9th Cir. 2014) (rejecting the contention that the "clear and convincing" requirement had been excised by prior Ninth Circuit case law). "This is not an easy requirement to meet: 'The clear and convincing standard is the most demanding required in Social Security cases.'" *Garrison*, 759 F.3d at 1015 (quoting *Moore v. Comm'r of Soc. Sec. Admin.*, 278 F.3d 920, 924 (9th Cir. 2002)).

### 2. ALJ findings

Here, the ALJ acknowledged the two-step process for assessing Plaintiff's symptom testimony. AR at 18–19. The ALJ then stated, "[a]fter considering the evidence of record, I find the medically determinable impairments could reasonably be expected to produce the alleged symptoms[;] [h]owever, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." *Id.* at 19. The ALJ reviewed the medical record and rejected Plaintiff's symptom testimony because 1) Plaintiff's back pain was only being treated by pain medication and he declined all other methodologies; 2) his activities of daily living were "strenuous" in the ALJ's opinion and therefore "his complaints of pain are not as severe as alleged"; and 3) Plaintiff only had "minimal psychotherapy and counseling for reported anger problems . . . [and] appears to enjoy spending time with his family, friends, and he continues to socialize on occasion, which further confirms he is mentally stable. *Id.* at 19–20.

### a. Back Pain

The ALJ acknowledged that "claimant has a history of low back and foot pain." AR at 19. The ALJ went on, however, to misstate the medical record in her analysis. The ALJ noted that Plaintiff's spinal cord stimulator was not working, yet he was still able "to twist

and bend forward to bring fingers to just below the knees with no difficulties." *Id.* (citations omitted). The ALJ clearly believes that Plaintiff's spinal cord stimulator was to treat his back pain, when its purpose was to treat his foot pain. *See* AR at 319, 358, 761–65 (failed surgery to correct a Morton's neuroma led to implantation of a spinal cord stimulator). The ALJ also discounts Plaintiff's consistent use of a cane, which was replaced by a walker when he was hospitalized. *See, e.g.,* AR at 743–61. The ALJ's misstatement of the medical records is legal error.

### b. Activities of Daily Living

The ALJ stated that "[t]he claimant also reported he spends his time most days outside working on his truck, which is inconsistent with complaints of disabling pain." AR at 19. The ALJ further stated that Plaintiff cooks "a lot"; however, Plaintiff's testimony, corroborated by his wife, clearly indicated that he only cooks ramen on a regular basis. *Id.* at 204, 215. The ALJ also stated that Plaintiff was remodeling his kitchen. *Id.* at 20. This, too, seems to be a misstatement of the record. Plaintiff received Home Improvements and Structural Alterations ("HISA") grants through Veterans Affairs in which workers were hired to perform remodeling. *See* AR at 579–80, 947–48.

"[T]he claimant need not show that [his] impairment could reasonably be expected to cause the severity of the symptom []he has alleged; []he need only show that it could reasonably have caused some degree of the symptom." *Smolen*, 80 F.3d at 1282 (citations omitted); *see also Trevizo v. Berryhill*, 871 F.3d 664, 678 (9th Cir. 2017). "Nor must a claimant produce 'objective medical evidence of the pain or fatigue itself, or the severity thereof.'" *Garrison v. Colvin*, 759 F.3d 995, 1014 (9th Cir. 2014) (quoting *Smolen*, 80 F.3d at 1282). "[A]n ALJ may not disregard [a claimant's testimony] solely because it is not substantiated by objective medical evidence[.]" *Trevizo*, 871 F.3d at 679 (citations omitted). The ALJ is further reminded that "[t]he Social Security Act does not require that claimants be utterly incapacitated to be eligible for benefits, and many home activities may not be easily transferable to a work environment where it might be impossible to rest periodically or take medication." *Smolen*, 80 F.3d at 1287 n.7 (citations omitted);

*Garrison*, 759 F.3d at 1016 (impairments that would preclude work are often consistent with doing more than spending each day in bed).

The Ninth Circuit Court of Appeals has "repeatedly warned that ALJs must be especially cautious in concluding that daily activities are inconsistent with testimony about pain, because impairments that would unquestionably preclude work and all the pressures of a workplace environment will often be consistent with doing more than merely resting in bed all day." *Garrison*, 759 F.3d at 1016 (citations omitted). Furthermore, "[t]he Social Security Act does not require that claimants be utterly incapacitated to be eligible for benefits, and many home activities may not be easily transferable to a work environment where it might be impossible to rest periodically or take medication." *Smolen*, 80 F.3d at 1287 n. 7 (citations omitted). The Ninth Circuit Court of Appeals has noted:

> The critical differences between activities of daily living and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter, can get help from other persons . . . , and is not held to a minimum standard of performance, as she would be by an employer. The failure to recognize these differences is a recurrent, and deplorable, feature of opinions by administrative law judges in social security disability cases.

*Garrison*, 759 F.3d at 1016 (quoting *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012)) (alterations in original). "While ALJs obviously must rely on examples to show why . . . a claimant['s] [symptoms are inconsistent with the evidence in the record] . . . the data points they choose must *in fact* constitute examples of a broader development to satisfy the applicable 'clear and convincing' standard." *Id.* at 1018 (emphasis in original) (discussing mental health records specifically).

Here, Plaintiff showed a medically determinable physical impairment that could reasonably be expected to produce the symptoms, and there is no evidence of malingering. The ALJ erred by misstating the evidence and discounting Plaintiff's symptom testimony on the basis of his daily activities.

### c. Behavioral health

The ALJ opined that Plaintiff's "treatment for PTSD has generally been stable and

he has continued routine medication management sessions at the Veteran [sic] Affairs hospital" and described his hospitalization for homicidal ideations as "exacerbations." AR at 20. The ALJ also stated that "the record reflects minimal psychotherapy and counseling for reported anger problems[,] . . . despite recommendation for treatment from his doctors and concurrence with this recommendation by his wife." *Id.*

Regarding mental health issues, "it is error to reject a claimant's testimony merely because symptoms wax and wane in the course of treatment." *Garrison v. Colvin*, 759 F.3d 995, 1017 (9th Cir. 2014). "Psychiatric evaluations may appear subjective, especially compared to evaluation in other medical fields[,] [and] [d]iagnoses will always depend in part on the patient's self-report, as well as on the clinician's observations of the patient[,] but such is the nature of psychiatry." *Buck v. Berryhill*, 869 F.3d 1040, 1049 (9th Cir. 2017). The ALJ is required to consider the "context of the overall diagnostic picture" and remember "[t]hat a person who suffers from severe panic attacks, anxiety, and depression makes some improvement does not mean that the person's impairments no longer seriously affect her ability to function in a workplace." *Holohan v. Massanari*, 246 F.3d 1195, 1205 (9th Cir. 2001). Plaintiff's medical record consistently acknowledge Plaintiff's PTSD and anger issues, in addition to other mental health diagnoses. AR at 300–07, 330–32, 352–53, 550–54, 590–97, 690–710, 743–61, 768–73, 800–807, 819–25, 829–41, 870–80, 1172–77, 1288–1356, 1378–83, 1414–16. The ALJ's findings are inconsistent with the medical record and therefore legally insufficient to discount Plaintiff's symptom testimony.

### C. Reviewing Physician Testimony

"The Commissioner concedes that the ALJ erred in disregarding the medical opinion of the State agency psychological consultant James Sturgis, Ph.D." Response (Doc. 21) at 2. Defendant seeks remand for further proceedings, rather than benefits.

### D. Remand

A federal court may affirm, modify, reverse, or remand a social security case. 42 U.S.C. §405(g). "'[T]he decision whether to remand the case for additional evidence or simply to award benefits is within the discretion of the court.'" *Rodriguez v. Bowen,* 876

F.2d 759, 763 (9th Cir. 1989) (*quoting Stone v. Heckler,* 761 F.2d 530, 533 (9th Cir. 1985)). "Remand for further administrative proceedings is appropriate if enhancement of the record would be useful." *Benecke v. Barnhart*, 379 F.3d 587, 593 (9th Cir. 2004) (*citing Harman v. Apfel,* 211 F.3d 1172, 1178 (9th Cir. 2000)). Conversely, remand for an award of benefits is appropriate where:

> (1) the ALJ failed to provide legally sufficient reasons for rejecting the evidence; (2) there are no outstanding issues that must be resolved before a determination of disability can be made; and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

*Benecke,* 379 F.3d at 593 (citations omitted). Where the test is met, "we will not remand solely to allow the ALJ to make specific findings. . . . Rather, we take the relevant testimony to be established as true and remand for an award of benefits." *Id.* (citations omitted); *see also Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995). "Even if those requirements are met, though, we retain 'flexibility' in determining the appropriate remedy." *Burrell v. Colvin*, 775 F.3d 1133, 1141 (9th Cir. 2014).

Here, the ALJ committed legal error in rejecting Plaintiff's symptom testimony and failing to address the opinions of reviewing physicians. Defendant urges that conflicts such as Dr. Sturgis's opinion that Plaintiff could not sustain a forty (40) hour work week versus the initial finding of not disabled and Plaintiff's subjective complains versus his activities of daily living require remand for further proceedings. Regarding the initial "conflict" and as Plaintiff indicates, "Mr. Rogers should have been awarded at his initial application based on Dr. Sturgis' report." Reply (Doc. 22) at 4. "Allowing the Commissioner to decide the issue again would create an unfair 'heads we win; tails, let's play again' system of disability benefits adjudication." *Benecke v. Barnhart*, 379 F.3d 587, 595 (9th Cir. 2004) (citations omitted). The Court finds that the record is well developed and no outstanding issues must be resolved before a determination of benefits can be made. The Court further finds that it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence properly credited.

## IV.    CONCLUSION

In light of the foregoing, the Court REVERSES the ALJ's decision and the case is REMANDED for further proceedings consistent with this decision.

Accordingly, IT IS HEREBY ORDERED that:

1)    Plaintiff's Opening Brief (Doc. 1) is GRANTED;

2)    The Commissioner's decision is REVERSED and REMANDED for calculation and award of benefits.  42 U.S.C. § 405(g); and

3)    The Clerk of the Court shall enter judgment, and close its file in this matter.


Dated this 16th day of September, 2019.

Honorable Bruce G. Macdonald
United States Magistrate Judge